**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-185 (APM)** |
| **RAYMUND CHOLOD, a/k/a Raymond Cholod,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Raymund Cholod, also known as Raymond Cholod, to 55 months' imprisonment – in the middle of the advisory guidelines range of 51 to 63 months – 3 years of supervised release, $2,000 in restitution, and a $100 special assessment.

## I.      INTRODUCTION

The defendant Raymund Cholod participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Cholod, a 54-year-old Florida resident, drove to Washington D.C. to attend the "Stop the Steal" rally in Washington, D.C. on January 6, 2021. After the rally, he joined the large crowd that marched to the West Plaza of the Capitol building. When the police line on the West Plaza was breached, Cholod followed the police up onto the Inaugural Stage, was one of the first rioters into the Lower West Terrace "tunnel," and was one of the first rioters to attack the police. Cholod pushed against the police in the tunnel for more than ten minutes before leaving. But Cholod stayed in the area outside the tunnel for almost two more hours, joining in additional group pushes against the police, helping other rioters attack the police, and throwing two sticks at the police. Cholod was one of the last rioters remaining in the tunnel area, staying near the tunnel attacking police until 5:00 p.m. when the police were finally able to clear the Inaugural Stage with help from the Virginia State Police. Since January 6, Cholod has shown no remorse for his actions that day. In fact, during his post-plea interview with the government, Cholod falsely claimed that the riot was instigated by an undercover government agent and that his own actions against the police were in self-defense.

The government recommends that the Court sentence Cholod to 55 months of incarceration. A 55-month sentence reflects the seriousness of Cholod's conduct and his complete lack of remorse since January 6.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

II.     FACTUAL BACKGROUND

A.     **The January 6, 2021 Attack on the Capitol**

The government refers the Court to the Statement of Offense filed in this case, ECF 43, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The government also refers the Court to Exhibit A, which is a video compilation of the timeline of events at the Lower West Terrace "tunnel," where, as discussed below, Cholod spent most of his time on January 6.[2]

B.   **Cholod's Role in the January 6, 2021 Attack on the Capitol**

Cholod drove to Washington, D.C. from his home in Florida for January 6. That morning, he attended the Stop the Steal Rally near the Ellipse where he watched President Trump's speech. After the speech, he heard that people were walking to the Capitol, and he joined the crowd.

By at least 2:00 p.m., Cholod, who was wearing a red "Trump 2020" hat with an American flag bill, a neck gaiter and a gray rain jacket, was on the West Plaza of the Capitol Building. At that point, the crowd had already become extremely hostile with rioters fighting and pushing the police who had formed a line there. For example, Cholod witnessed other rioters getting sprayed with OC spray and the deployment of tear gas on the West Plaza.

---

[2]  The government will provide the Court and defense counsel with copies of its sentencing exhibits via USAfx after filing of this memorandum.



*Image 1: Still Image from Exhibit B at Timestamp 1:12 Showing Cholod Covering His Face After Deployment of Tear Gas on the West Plaza*

He also saw the deployment of riot control munitions by the police on the West Plaza. *See* Exhibit B at timestamp 1:26. But Cholod didn't turn around and leave. He stayed. And when the police were forced to retreat up to the Inaugural Stage and into the Lower West Terrace tunnel, he followed.

At 2:41 p.m., Cholod entered the tunnel.



*Image 2: Still Image from CCTV Footage Showing Cholod Entering the Tunnel*

At the time he entered, the first set of doors in the tunnel were closed and locked, and a police line had been formed just behind it. *See* Exhibit A, beginning at timestamp 2:00. Less than one minute after he entered the tunnel, rioters smashed the glass of the locked doors and pulled the doors open, quickly attacking the police line. *Id.* beginning at timestamp 2:32. By 2:44 p.m., Cholod was at the front of the rioters in the tunnel up against the police line.



*Image 3: Still Image from Exhibit C, MPD Body-Worn Camera Footage, Showing Cholod up against the Police Line in the Tunnel*

  While pushing up against the police in the tunnel, Cholod wagged his finger in an officer's face and screamed, "They stole it and you know it! They fucking stole this!" Exhibit C, body-worn camera footage at timestamp 14:44:40; Exhibit D, open-source video, at timestamp 1:05. Cholod also elbowed a police officer, Sergeant P.N., in the face while in the tunnel.



*Image 4: Still Image from Exhibit D, Open-Source Video, at Timestamp 2:05, Showing Cholod
Pushing an Officer in the Face with His Forearm*

As Cholod pushed Sergeant P.N., Sergeant P.N. pleaded with him saying, "Sir, stop! Please

stop!" Exhibit D, at timestamp 2:07. Shortly thereafter, Cholod grabbed the edge of a police riot

shield.



*Image 5: Still Image from Exhibit D at Timestamp 2:27 Showing Cholod Grabbing a Shield*

Cholod stayed near the police line in the tunnel for at least five more minutes. At 2:49 p.m., a rioter sprayed the police line with a fire extinguisher in the tunnel (*see* Exhibit E, body-worn camera footage at 14:49:23), but still Cholod stayed near the police.



*Image 6: Still Image from Exhibit E, Body-Worn Camera Footage, at Timestamp 14:52:39, Showing Cholod at the Police Line After Fire Extinguisher Deployed*

Cholod stayed at the police line for a few more minutes after the fire extinguisher was deployed and then left the tunnel at 2:54 p.m.



*Image 7: CCTV Footage Showing Cholod Leaving the Tunnel*

9

But even after leaving the tunnel, Cholod stayed in the area near the tunnel for at least another hour and a half. At approximately 3:18 p.m., the police cleared the tunnel of rioters, pushing everyone out onto the Inaugural Stage. *See* Exhibit A, at timestamp 6:49. They then established a police line under the archway. Cholod stayed on the Inaugural Stage and participated in numerous other attacks on the police line after the clearing of the tunnel.

For example, at about 3:50 p.m., the crowd outside the tunnel began to rock in unison calling out "HEAVE! HO!" as it pushed against the police line. Cholod was in that crowd and pushed along with the other rioters.



*Image 8: Still Image from Exhibit F, Open-Source Video, at Timestamp 00:20, Showing Cholod Rocking with Other Rioters Against the Police*

After pushing against the police with the crowd, Cholod made his way through the dense crowd and to the police line at the tunnel at about 4:00 p.m.

10



*Image 9: Still Image from CCTV Footage Showing Cholod at the Police Line at 4:00 p.m.*

At the police line, Cholod joined numerous other rioters and pushed up against the police

as others nearby yelled out, "grab their hands and pull them out! Pull them out!"



*Image 10: Still Image from Exhibit G, Open-Source Video, at Timestamp 00:29 Showing Cholod*
*Pushing with Rioters Against the Police*

At approximately 4:30 p.m., the crowd near the archway had thinned out and was no longer

pushing up against the police. But Cholod still had not left. As rioters at the tunnel continued to

assault police by striking them with poles, Cholod bent down, picked up a black stick and threw it forcefully into the mouth of the tunnel.



*Image 11: Still Image from Exhibit H, Open-Source Video, at Timestamp 9:00 Showing Cholod Throwing Black Pole at Police*

And still, Cholod did not leave the tunnel. At approximately 4:47 p.m., a rioter set off what appeared to be a smoke bomb near the police line at the tunnel. Cholod was right there at the police line, holding another large stick or pole when the smoke bomb went off and he was forced to retreat.



*Image 12: Still Image of Exhibit I, Open-Source Video, at Timestamp 00:04 Showing Cholod
with a Large Stick in His Hand at the Police Line*

At approximately 5:05 p.m., the police at the tunnel were finally able to clear the tunnel
and surrounding area of rioters. *See* Exhibit A at timestamp 11:20.

### C.  Cholod's Post-Plea Interview with the Government

On May 13, 2024, Cholod and his attorney met with the government via zoom pursuant to
the terms of his plea agreement. During that interview, Cholod told the government that he drove
to Washington, D.C. from his home in Florida alone. He stated that he joined the crowd that
marched to the Capitol and arrived on the West Plaza. He claimed that the crowd at the West Plaza
was peaceful until the police began to use munitions against the crowd. He also claimed that Ray
Epps, another January 6 defendant, had instigated the riot on the West Plaza. When asked about
his conduct at the police line inside the tunnel, Cholod claimed that he was merely defending
himself against the police who attacked him and others with "billy clubs" and that he merely rested
his hand on a shield but did not otherwise attack the police. At this point, the interview was

terminated.

### III.   THE CHARGES AND PLEA AGREEMENT

On May 31, 2023, a federal grand jury returned an indictment charging Cholod with seven counts. ECF No. 27. On February 9, 2024, a superseding information was filed charging defendant with one count of assaulting, resisting, and impeding law enforcement officers, in violation of Title 18, United States Code, Section 111(a)(1). ECF No. 38. Cholod was convicted of that offense based on a guilty plea entered pursuant to a plea agreement. ECF No. 40.

### IV.   STATUTORY PENALTIES

Cholod now faces sentencing on Count One of the superseding information for assaulting, resisting, and impeding law enforcement officers, in violation of Title 18, United States Code, Section 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Guidelines calculation set out in the PSR, except that the government disagrees that the defendant is entitled to a reduction for acceptance of responsibility, as discussed below. The correct Guidelines calculation is:

| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **24** |

*See* Plea Agreement at ¶¶ 5(A).

## A. Acceptance of Responsibility

The PSR also includes a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and an additional one-level decrease pursuant to U.S.S.G. § 3E1.1(b). Because the defendant refused to accept responsibility in a post-plea interview with the government, the government does not at this time plan to move for the third point under § 3E1.1(b) and no longer believes that the defendant should receive a two-level reduction under U.S.S.G. § 3E1.1(a).

Because of the defendant's statements at the May 13 interview, the government does not currently believe Cholod has clearly demonstrated acceptance of responsibility for his offense conduct and should receive a decrease under U.S.S.G. § 3E1.1(a) and (b). Therefore, the defendant's total offense level should be 24.

Acceptance of responsibility is not a boilerplate or meaningless motion. It is an appreciation that the defendant truthfully admits the conduct comprising his crime. *See* §3E1.1 n.1(A). The plea agreement further allows the government to exercise its reasonable discretion under 3E1.1, noting that the defendant must "clearly demonstrate[] acceptance of responsibility,

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. In the plea agreement, the parties agreed that Cholod's offense conduct constituted aggravated assault and that § 2A2.2 was the applicable guideline.

to the satisfaction of the Government." ECF No. 40, at 3 ¶ 2-3 (noting that nothing limits the right of the Government to deny such acceptance after the actual plea itself). This Court is familiar with this process, given its prior decision in *United States v. Audrey Southard-Rumsey*, 21-cr-387-APM, where the Court denied acceptance of responsibility to a defendant who truly did not accept the conduct or consequences of her actions.

Here, the defendant's plea agreement requires that he demonstrate acceptance of responsibility not just at the time of the plea, but also during the period between plea and sentencing. Courts routinely deny the acceptance of responsibility reduction to defendants whose post-plea conduct belies their claims of contrition. For example, in *United States v. Wineman*, 625 F.3d 536 (8th Cir. 2010), the defendant pled guilty to a drug conspiracy. Twenty days after his guilty plea, however, the defendant created an internet post in which he blamed his crime on the "addicts" who bought his products and the officials who denied him disability benefits, thus necessitating his drug dealing. *Id.* at 537-38. The sentencing court found that the internet post was "inconsistent with any acceptance of responsibility" by the defendant. *Id.* at 539. *See also United States v. Godfrey*, 863 F.3d 1088 (8th Cir. 2017) (defendant denied acceptance reduction based on repeated post-plea false statements claiming to have acted in self-defense or to have discharged firearm in air, claims which were contradicted by surveillance video and physical evidence); *United States v. Jeffries*, 569 F.3d 873 (8th Cir. 2009) (defendant who pled guilty to abusive sexual conduct denied acceptance reduction based on letters to probation office and sentencing judge denying any use of force and claiming that the relationship was consensual); *United States v. Guerrero*, 768 F.3d 351 (5th Cir. 2014) (defendant convicted of assaulting corrections officer

denied acceptance reduction for telling probation that he felt the officer "disrespected" him and that "men have to understand the consequences of disrespecting another man").

Here, during the defendant's post-plea interview, he claimed that he was attacked by the police on the West Plaza, that fellow January 6 defendant Ray Epps instigated the riot and that he was "beaten with billy clubs" by the police inside the tunnel. Cholod made these statements despite being admonished that he must tell the truth and to focus on his specific conduct that day. Critically, Cholod also claimed that he made physical contact with the police only in self-defense and denied assaulting any police officers in the tunnel. These claims directly contradict the facts set out in the signed Statement of Offense. *See* ECF No. 43, ¶ 9 ("Cholod pushed up against a nearby police officer despite the officer telling him to 'stop' and briefly grabbed the edge of a U.S. Capitol police riot shield."). He thus did not "truthfully admit[] the conduct comprising the offense(s) of conviction." U.S.S.G. § 3E1.1, n.1(A).

### B. 4C1.1

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

Section 4C1.1 does not apply in this case because Cholod used violence and credible threats of violence against people or property under a totality of the circumstances, and Cholod possessed a dangerous weapon as broadly defined in 1B1.1 cmt. n.1. *See* U.S.S.G. § 4C1.1(a)(3), (7). For

example, Cholod used violence when he pressed up against the police in the tunnel, including pushing his elbow up against MPD Sergeant P.N. He also possessed and used a dangerous weapon – namely, a long black pole – which he threw forcefully at police in the tunnel.

The U.S. Probation Office calculated Cholod's criminal history as category I, which is not disputed. PSR ¶ 49. Accordingly, based on the government's calculation of Cholod's total adjusted offense level at 24, Cholod's Guidelines imprisonment range is 51 to 63 months' imprisonment. Cholod's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein, except that the above calculation does not include a reduction for acceptance of responsibility.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Cholod's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Cholod was one of the first rioters into the Lower West Terrace tunnel on January 6 – the location of the most violent and prolonged attacks on the police that day – and he was among the last rioters to leave, spending over two hours repeatedly attacking the police. It was because the persistence of rioters like Cholod that the fight at the tunnel was so long and vicious. The nature and circumstances of Cholod's offense were, therefore, of the utmost

seriousness, and fully support the government's recommended sentence of 55 months' imprisonment.

**B.     The History and Characteristics of the Defendant**

Cholod is 54 years old and has two children. He currently works at a McDonald's in Tampa, Florida and lives in a homeless shelter, despite owning two pieces of real estate in New York and Florida. PSR ¶ 81. He has a history of mental illness, including a previous attempted suicide. He has no criminal history aside from convictions for traffic infractions. Cholod appears to have had a stable upbringing, free from poverty, abuse or neglect. He had every opportunity to make other choices on January 6, 2021, but he chose to drive to the Capitol and attack the police for more than two hours, all because he was upset about the outcome of an election.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Cholod's criminal conduct on January 6 was the epitome of disrespect for the law. As Judge Berman Jackson recently remarked, "we cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. It is clear from Cholod's post-plea interview with the government that he feels no remorse for what he did at the Capitol, and, in fact, believes that his actions against the police that day were justified. Cholod's lack of remorse is a strong indication that he is a high risk of recidivism, particularly in light of the next upcoming presidential election.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*,

545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Scott Miller*, 22-CR-412 (TSC). Miller, like Cholod, attacked police officers at the tunnel by striking them with poles and throwing objects at them. However, unlike Cholod, Miller never entered the tunnel and spent less than a half hour attacking the police there. Miller also had no criminal history. Miller pleaded guilty through a plea agreement to assaulting,

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

resisting, and impeding officers with a deadly or dangerous weapon, in violation of Title 18, United States Code, Section 111(b). Judge Chutkan sentenced Miller to 66 months' imprisonment, in the middle of the applicable Guidelines range. Like Miller, the government is requesting that this Court impose a middle-of-the-guidelines sentence of 55 months' incarceration for Cholod.

*United States v. Devlyn Thompson*, 21-CR-461 (RCL). Thompson, like Cholod, spent hours at the tunnel on January 6. During that time, Thompson assisted other rioters by handing up several items to be used against the police including shields and improvised weapons. Thompson also obtained a stolen police baton and struck an officer on the hand with it before leaving the tunnel. Thompson, like Cholod, remained in the area near the tunnel for the rest of the day. However, unlike Cholod, Thompson did not engage in additional assaults against the police at the tunnel. Thompson also fully cooperated with the FBI after his arrest and expressed genuine remorse for his actions that day. Thompson pleaded guilty via plea agreement to assaulting, resisting, and impeding officers with a deadly or dangerous weapon, in violation of Title 18, United States Code, Section 111(b). Judge Lamberth sentenced him to 46 months' imprisonment, at the bottom of the applicable Guidelines range, in recognition of his remorse and cooperation with the government. Cholod should receive a longer sentence in this case because, unlike Thompson, Cholod engaged more assaultive conduct in the tunnel and has shown no remorse for his conduct on January 6.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer P.N., did not suffer bodily injury as a result of Cholod's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cholod must pay $2,000 in restitution, which reflects in part the role Cholod played in the riot on January 6.[8] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

has since been updated by the Architect of the Capitol, USCP, and MPD.) Cholod's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 13.

## VIII.   FINE

The defendant's convictions for a violation of 18 U.S.C. § 111(a) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR include two pieces of real estate worth more than $150,000 combined. PSR ¶ 81. Despite the defendant's current living situation, the Court should consider whether these assets enable him to pay a fine in this case.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 55 months' imprisonment, 3 years of supervised release, $2,000 restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Kaitlin Klamann*
KAITLIN KLAMANN

25

Assistant United States Attorney
IL Bar No. 6316768
601 D Street NW,
Washington, D.C. 20530
kaitlin.klamann@usdoj.gov
(202) 252-6778

NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW,
Washington, D.C. 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759

26